JUNE OLINE, ADMINISTRATRIX OF THE ESTATE OF ROLAND
O. OLINE, DECEASED, APPELLANT, V. NEBRASKA NATURAL
GAS COMPANY, A CORPORATION, APPELLEE.

131 N. W. 2d 410

Filed November 20, 1964. No. 35830.

William S. Padley, for appellant.

852

Stewart & Stewart, for appellee.

Heard before WHITE, C. J., CARTER, MESSMORE, SPENCER, BOSLAUGH, and BROWER, JJ., and DIERKS, District Judge.

BROWER, J.

This action was brought in the Nebraska Workmen's Compensation Court by June Oline, Administratrix of the Estate of Roland O. Oline, deceased, plaintiff, against Nebraska Natural Gas Company, a corporation, which will at times herein be called the company, to recover for the accidental death of the plaintiff's intestate under the Workmen's Compensation Act of the State of Nebraska. It was brought on behalf of the decedent's widow and three minor children.

A trial before a single judge of said compensation court resulted in a finding that the plaintiff had failed to maintain the burden of proving that the accident resulting in the death of the decedent arose out of and in the course of his employment, and dismissed the petition.

The plaintiff thereupon waived a hearing before the entire Nebraska Workmen's Compensation Court and elected to appeal directly to the district court for Dawson County, Nebraska. On appropriate pleadings filed therein by the parties to raise the issue herein discussed, a trial de novo was held in said district court which resulted in a similar finding that the plaintiff had failed to prove by a preponderance of evidence that the decedent's death arose out of and in the course of his employment by the defendant, and the petition filed in that court was likewise dismissed because thereof.

The motion of plaintiff for a new trial having been overruled, the plaintiff has brought the matter to this court by appeal.

The plaintiff assigns error to the trial court: In failing to find that decedent's death arose in the course of his employment; in failing to find the plaintiff proved a prima facie case; and in failing to find the burden of showing that decedent was operating the motor vehicle

on his own time during the period of travel from his place of employment to his home for lunch had shifted to defendant.

There is no dispute of substance with respect to the facts herein. Roland O. Oline met his death in a railroad crossing accident on December 28, 1961, in the city of Gothenburg, Nebraska. On that day and for more than 11 years previously he had been employed by the defendant in the operation of its natural gas distribution system in Gothenburg. He had been a faithful, conscientious, and efficient employee. His duties were generally: Servicing gas lines; the installation and servicing of appliances; repair of the gas lines; adjusting and regulating valves controlling the flow of gas in the defendant's lines; digging ditches for such lines; connecting new customers and disconnecting old customers; and in some instances, reading meters and making collections. His regular employment was on a weekly basis of 44 hours a week, coming to work at 8 a.m., and continuing until noon. After an hour off for lunch he regularly would return at 1 p.m., and work until 5 p.m.

The defendant company employed at Gothenburg a manager, an office girl, and three workmen. The three workmen which included the decedent were all engaged in much the same work. They assisted one another and at times worked together. The company also had three pickup trucks. One was used by the manager and another by the other two workmen. Apparently the deceased had been employed by the company for a longer period than either of the other workmen. Although it was not particularly assigned to him, he alone had used the third pickup regularly. He drove it in his work for the company and in going to and from work, and so used it in going home for lunch. It was kept at his premises all night. Decedent and the other workmen were on emergency call. Their names were listed in the local telephone directory as being subject to such call on behalf of the company. If called at night or at the noon

hour by reason of an emergency, they were supposed to respond to the call. They kept track of their own time for such irregular work and gave a slip showing it to the office girl.

The southern portion of Gothenburg is traversed by the main line of the Union Pacific Railroad. The streets are laid out parallel with or at right angles to the tracks. They will be referred to herein as running east and west, and north and south, although their direction is not true with that of the compass.

The company's office is on the west side of Lake Avenue which extends north and south through the city and is paved, being also State Highway No. 47. The office is a little south of the northeast corner of Block 9 of the Original Town of Gothenburg. Lake Avenue intersects with Eighth Street, which is also U. S. Highway No. 30, at the southeast corner of said Block 9. U. S. Highway No. 30 runs east and west parallel with and adjacent to the Union Pacific right-of-way on its north. This right-of-way is 400 feet wide. South of the right-of-way, Seventh Street extends east and west adjoining and parallel to the right-of-way also. There are three streets or highways in the city limits of Gothenburg which have crossings on them across these railway tracks. One some distance west of those mentioned hereafter is of no significance in this opinion. The main crossing is on Lake Avenue, or Highway No. 47, and it is the only one of them that is paved. The decedent's residence was on the south side of Seventh Street in the fifth block east of the Lake Avenue railroad crossing. It is therefore about 6 blocks plus the 400 feet of right-of-way and the width of U. S. Highway No. 30 from the company's office going south on Lake Avenue and then east on Seventh Street.

On the morning of December 28, 1961, the deceased reported to work at the company office at 8 a.m., with the pickup. He was joined there by Donald Turnquist, another one of the workmen and a fellow employee.

Together shortly after 8 a.m., they drove in the company pickup to the McVay-Olesen Funeral Home 1 block north and 2 blocks east of the office. They were there engaged in moving a wall gas furnace from the front office to a garage.

There is a shop and repair room, separated by a partition from the office, at the back of the gas company building from which doors lead to the office in front and outside to a parking space at the rear. In the shop there are supplies and fittings such as might be generally necessary in doing the work of the company. Between 10 and 10:30 a.m., both men returned to the office but it is not shown why they did so. Turnquist, who testified, did not recall whether or not they returned although he does remember having coffee with Oline at the "Lake Avenue Lunch" later in the morning.

Having completed a phase of their work, although installing the vent remained to be done, they left the funeral home. As near as Turnquist could recall except for the vent they were all hooked up and ready to go. To do that, shutting off the gas was not necessary. Turnquist said they intended to come back after lunch. Turnquist looked at his watch on leaving and remembers it was then 20 minutes until noon. They drove in the company pickup from the funeral home directly to the parking space back of the office entering in the alley which runs east and west through the block from Lake Avenue and turned north into the parking spot. Turnquist got out of the pickup and went to his own car which he had left there. Oline said to him as he left the pickup, " 'I will see you after lunch.' " Turnquist had to back his car out before Oline could get the pickup out. Turnquist drove away while Oline was still in the pickup and the witness says he did not observe what Oline did thereafter and never saw him again. Turnquist stopped to get some groceries and then went home.

Oline, being of longer service with the company, supervised the work when they were together. There

was no conversation between them concerning why they left the funeral home before noon. Nothing was said by Oline about going to the border station mentioned later herein. They just left together. They had not talked specifically about going back to the funeral home after lunch. Turnquist and another employee, however, finished it the next day after Oline's death. Turnquist and the deceased had no conversation as to what Oline intended to do and he did not mention having any other duty to perform. Turnquist had never ridden home with Oline and did not know the route he usually took.

Roger Peden, a witness and employee of the Cozad Ditch Company who lived at Gothenburg and knew Oline, while on his way to his company's diversion dam where there was ice trouble, was held up on the north side of the Lake Avenue railroad crossing by the presence of a freight train standing on the tracks. He said he came there about 11:40 and was in his International ½-ton pickup accompanied only by his 5-year-old son. After Peden had been there about 5 minutes, Oline drove up in the company pickup from behind. Peden did not wait for the traffic to clear but backed up on the depot platform and turned about. In doing so, he greeted Oline by his nickname and called out, " 'Hi,' Swede.' * * * 'It's just about noon.' " Oline responded to Peden saying, " 'You are going the wrong way.' " Peden explained to him that he was going to the "diversion" down off the highway. He did not see Oline again or observe him following. Peden then drove onto U. S. Highway No. 30 and proceeded on eastward to another of the three crossings about half a mile east. Turning there and crossing the tracks he observed a freight train coming from the east about a quarter or a half a mile from the crossing. Completing the crossing he drove about a half mile south and then a quarter of a mile to the diversion, got out, and while holding an ice bar breaking ice he heard the noon whistle blow at Gothenburg.

The evidence shows it was usually blown quite accurately as to time. Oline was killed when his pickup was struck by this same freight train at this crossing. The damage to the pickup appeared to be on the left front side. The south end of the crossing where the accident occurred intersects Seventh Street about 1 block east of the decedent's home. To reach the border station Oline would have had to drive approximately 5 blocks past his home westward on Seventh Street.

The plaintiff contends there is testimony which raises an inference that Oline was going to the border station of the company to regulate the gas pressure and therefore was on his employer's business at the time of the accident. The defendant company obtains its supply of gas from the Kansas-Nebraska pipeline. It comes in under a high pressure of from 400 to 700 pounds per square inch. It is reduced to the pressure of 10 to 30 pounds, depending on the weather, which appears a sufficient reduction to serve the older portion of the system in Gothenburg. This first reduction occurs at the border station. The new portion which is further north is a low pressure system. For this latter portion the pressure is further reduced to ounces, the pressure in residential areas being 6 ounces per square inch generally. There are six of these stations in Gothenburg. The regulator stations making the second reduction being all on the north side of the tracks in the residential and business districts. The regulation is done by hand with a crescent wrench requiring the presence of a man.

In the wintertime this regulation at the border station is usually done two or three times a day. Its frequency depends on the weather and the use of gas. If the weather turns cold, the pressure is stepped up somewhat and if it becomes warm it is reduced. The regulators are generally adjusted in the morning when the use of gas furnaces and appliances is stepped up by the customers. Sudden changes in weather also require adjusting these regulators. There is a gauge near the outside shop door

which indicates the pressure and if the pressure at the border station is changed it shows on the gauge. It is also necessary to watch the pressure at the Twentieth Street station, which is farthest from the border station. The pressure at the Twentieth Street station and the gauge and a pressure chart in the back end of the office would disclose the need of attention at the border station. In the winter one of the employees generally adjusts the regulators on coming to work. The three workmen and the manager generally make the adjustments although Turnquist, the youngest in point of service, did so rarely. Apparently the three workmen take turns by the week in the regulation of these stations in early morning before the manager comes to work although it seems that this is not always followed. Sometimes the one who comes the earliest tends to it. The men occasionally regulated them on their own initiative on weather changing. The week of the accident it appears Aubushon, the third workman, was the one to make the early morning adjustment at the border station and the manager says as he recalls he had done so. The manager, Wayne Gronewold, testified he again regulated the border station and another known as the D Street station, the latter being a short distance from the office, that morning between 10 and 11 o'clock. This was done because the weather had warmed up somewhat. The pressure was not then cut down very much. He had also sent Oline himself "up the hill" to regulate the Twentieth Street station during the period while he was present at the office between 10 and 10:30. Oline had returned after about 15 minutes and reported that he had attended to this adjustment. Oline's adjustment at the Twentieth Street station and the manager's at the border station were made about the same time. The manager and office girl both testified that when Oline was at the office with Turnquist it was reported to him that the manager had made the adjustment at the border station. Neither the manager nor

the secretary saw Oline again after he left the office. If there was too much pressure it would not damage the system unless "it got tremendous," but it would result in blowing out pilot lights and water heaters.

The plaintiff puts great stress on the location of the border station being on Seventh Street about 6 blocks west of the east crossing where the accident happened. At the same time it appears the decedent's residence was only about 1 block west of the crossing on the same street. It is argued that it may be inferred that Oline was enroute to that station and not to his home. The Lake Avenue crossing where he first went would have taken him within 1 block of this station but it was also his shortest route to his home. It is urged that noon had not come when he left the funeral home and that Oline was a faithful, conscientious, and efficient employee. From all of which plaintiff contends a prima facie case has been made.

In completing the résumé of the evidence, the following should be mentioned. Oline's wife was away from home on the day of the accident and knows nothing of his actions. There is no testimony concerning the length of time the freight train continued to block the Lake Avenue crossing after the witness Peden drove away. Nothing is shown concerning the weather that day at Gothenburg after the adjustment at the border and other stations at or near 10 a.m., which had been reported to the decedent. There is testimony that the company was not too exacting as to the time the men came to work or left depending a little on whether they had previously worked a little overtime or vice versa.

The statutory provisions of the Nebraska Workmen's Compensation Act applicable to the case before us should here be set out as follows. Section 48-101, R. R. S. 1943, provides in part: "When personal injury is caused to an employee by accident or occupational disease, arising out of and in the course of his or her employment, of which the actual or lawful imputed

negligence of the employer is the natural and proximate cause, such employee shall receive compensation therefor from his or her employer if the employee was not willfully negligent at the time of receiving such injury."

Another provision which is pertinent to and explanatory of the section of the statute already quoted, reads in part as follows: "(6) Without otherwise affecting either the meaning or the interpretation of the abridged clause, personal injuries arising out of and in the course of employment, it is hereby declared: Not to cover workmen except while engaged in, on or about the premises where their duties are being performed, or where their service requires their presence as a part of such service at the time of the injury, and during the hours of service as such workmen, and not to cover workmen who, on their own initiative, leave their line of duty or hours of employment for purposes of their own." § 48-151, R. R. S. 1943.

In construing this statute, this court has held in Seger v. Keating Implement Co., 157 Neb. 560, 60 N. W. 2d 598: "A compensable injury within the provisions of the Workmen's Compensation Act is one caused by an accident arising out of and in the course of the employment.

"Whether an accident arises out of and in the course of the employment must be determined by the facts of each case. There is no fixed formula by which the question may be resolved. * * *

"The rule of liberal construction of the Workmen's Compensation Act is related to determination of the scope of the act and does not apply to evidence produced to establish a claim for compensation. * * *

"In determining whether a risk arises out of the employment, the test to be applied to any act or conduct of an employee which does not constitute a direct performance of his work is whether it is reasonably incident thereto, or whether it is so substantial a devia-

tion as to constitute a break in the employment and to create a formidable independent hazard."

The case of Berry v. School District, 154 Neb. 787, 49 N. W. 2d 617, involved a situation where a school teacher was injured while in the act of returning from lunch at the high school building. The court held: "The general rule is that if an employee is injured while absent from the employment for lunch, the injury does not arise out of nor in the course of the employment."

In Appleby v. Great Western Sugar Co., Inc., 176 Neb. 102, 125 N. W. 2d 103, this court in its syllabi stated: "In order to recover under the Workmen's Compensation Act, the plaintiff must prove that the death or disability of the workman was the result of an accident arising out of and in the course of the employment. * * *

"The words 'arising out of' refer to the origin or cause of the accident and are descriptive of its character, while the words 'in the course of' refer to the time, place, and circumstances of the accident."

An appeal to this court in a workmen's compensation case is considered and determined de novo upon the record, and to entitle the plaintiff to a recovery he must sustain the burden of proof by a preponderance of the evidence that he suffered an accident arising out of and in the course of his employment. Klentz v. Transamerican Freightlines, Inc., 173 Neb. 53, 112 N. W. 2d 405.

The deceased died because of the collision at the railroad crossing. What does this evidence show as to why he was at the railroad crossing at that time? Was he attending the company's business or on that of his own? Was he on his way to lunch? Was he going to the border station? Was he going on a call for his employer no one else knew about? The testimony of Turnquist furnishes some light on these questions. They had finished one phase of the work at the funeral home. Installing the vent remained. Although no conversation

between the deceased and Turnquist was related, the latter said they intended to return. They left their work at 20 minutes until noon. The two employees drove to the parking lot and Oline then said, " 'I will see you after lunch.' " Turnquist had to back out before Oline could go. This he did, going to get his groceries and then home. Oline had said nothing of checking the border station at noon. Oline appeared at the Lake Avenue crossing at a quarter to noon and drove up behind Peden in the company pickup. It was on his direct and closest way both to the border station and his home. Peden did not wait for the traffic to clear but backed up, turned about, and went to the east crossing. He said the train involved in the fatal accident was a quarter to a half mile east. How long before the traffic cleared is not shown. In a very short time the deceased was killed at the same crossing within a block and a half from his home. It was necessary to cross the tracks either to arrive at his home or to go to the border station. Under these circumstances, is the evidence sufficient to make a prima facie case that he was en route to the border station and upon the business of his employer when no change in the weather is shown and no directions for him to check the regulator were shown? Whether there is enough shown to determine that he was going to lunch is not the question before us. The real question is: Has it been affirmatively shown that he was on his employer's business at the time of the accident? The burden to prove that the accident arose in the course of the decedent's employment was on the plaintiff. Klentz v. Transamerican Freightlines, Inc., *supra*. An award under the Workmen's Compensation Act may not be based upon possibilities, probabilities, or conjectural evidence. Seger v. Keating Implement Co., *supra*.

The plaintiff having failed to prove the accident causing the decedent's death arose out of the course of his employment, the trial court was correct in its finding in

favor of the defendant and dismissing the plaintiff's peti-
tion, and its judgment must be and is affirmed.

AFFIRMED.